J-S04016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| B.T.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.N.F. | : | |
| | : | |
| Appellant | : | No. 1734 MDA 2018 |

Appeal from the Order Entered October 5, 2018
In the Court of Common Pleas of Franklin County
Civil Division at No(s): FR 2008-4917

BEFORE: SHOGAN, J., OTT, J., and STEVENS*, P.J.E.

MEMORANDUM BY OTT, J.:                    **FILED MARCH 14, 2019**

J.N.F. ("Mother") appeals from the order entered on October 5, 2018, in the Court of Common Pleas of Franklin County, denying her request for primary physical custody of the parties' daughter, L.N.M., born in July of 2007. Upon careful review, we affirm.

The certified record reveals protracted child custody litigation between Mother and B.T.M. ("Father") since 2008, when Father commenced the underlying action. On December 19, 2017, Mother filed a petition to modify the existing custody order, wherein she requested primary physical custody. The existing agreed-upon custody order, dated February 29, 2016, granted the parties shared legal and equally shared physical custody of L.N.M., and it

---

* Former Justice specially assigned to the Superior Court.

set forth a holiday schedule. The shared physical custody schedule was based on a biweekly 2/2/3 day schedule, as follows: In week one, the existing custody order granted Father custody from Monday at 4:00 p.m., through Wednesday at 4:00 p.m., and Mother from Wednesday at 4:00 p.m., through Friday at 4:00 p.m. Father then had custody again from Friday at 4:00 p.m., through Monday at 4:00 p.m. In week two, the existing custody order divided the week in the same increments, but granted Mother and Father the opposite custody periods from week one.

On May 30, 2018, a custody trial occurred on Mother's modification petition. Mother testified on her own behalf, and she presented the testimony of her paramour, D.C.; her paramour's mother, D.C.; and the asset protection coordinator at Giant Foods, Steven Hunt, who authenticated video surveillance from a grocery store parking lot on December 1, 2017. Father testified on his own behalf, and he presented the testimony of his wife, T.M. ("Stepmother"); and his mother, N.M.

In addition, the trial court interviewed L.N.M. *in camera* in the presence of the parties' counsel, at which time she was ten years old and in fifth grade. L.N.M. testified that in Mother's house reside Mother's paramour, L.N.M.'s two younger half-brothers, and her younger half-sister. N.T., 5/30/18, at 213. She also has a pet rabbit at Mother's house. *Id.* at 219. L.N.M. testified that in Father's house reside Stepmother and Stepmother's daughter, A.G., who is her younger stepsister, then age seven. She testified that, at Father's house,

"We have three pigs, one miniature pony, and one dog." ***Id.*** at 207. With respect to her custody preference, L.N.M. testified:

Q. So you were saying that you have . . . A couple of days with your mom then a couple days with your dad, couple days with your mom, couple of days with your dad, right?

A. Um-hum.

Q. That's been going on for quite a while, hasn't it?

A. Um-hum.

Q. How does that make you feel?

A. Okay. It makes me feel happy that I get to see both sides.

Q. Have you thought at all if any other situation would make you happier or not?

A. Yeah.

Q. Yeah. So what were you thinking?

A. That sometimes I can, like, see my dad, like, every other weekend and, like, sometimes on Wednesdays.

Q. Um-hum. And why do you think that?

A. Because, like, sometimes there's, like, a lot of drama. And my parents fight a lot.

Q. Tell me something, if they didn't fight, would you be happier?

A. Yes.

Q. And if they didn't talk about their fights in front of you, would that make you happier?

A. Um-hum.

Q. If they just kind of chilled out?

A. Um-hum. And, like, agreed, like, and, like, took me to the sports I want to do.

*Id.* at 225-226. L.N.M. testified, "I like soccer a little bit more than cheerleading."[1] *Id.* at 219.

L.N.M. testified that she feels "more safe at my mom's house." *Id.* at 215. She explained, "Because, like, when [Mother and her paramour] get in bad moods, like, they don't punch holes in the wall and stuff like that.[2] They,

_____

[1] L.N.M. testified Stepmother asked her to try cheerleading, and she told Stepmother that Mother had "already signed me up for soccer." N.T., 5/30/18, at 220. Mother testified that she did not enroll L.N.M. in soccer during fifth grade, "Because it was just too much. Last year, her second year in soccer, [Father] didn't take her at all, not one practice, not one game." *Id.* at 34.

[2] L.N.M. testified that, "a couple months ago" Father and Stepmother "were fighting in the laundry room. But I didn't see [Father put a hole in the wall]. But I heard it happen in the laundry room." *Id.* at 244. She continued:

Q. You know there wasn't a hole in . . . the wall before?

A. No. They covered it up with a desk at first. Then afterward, they moved it and I saw it.

Q. Okay. But they were fighting?

A. Yes.

Q. Did you actually see anybody kicking or punching anything?

A. No.

Q. You just heard noise?

like, don't take it out on other people. Like, they just, like, are calm about it. And, like, if they yell, it's, like, like, it's not -- they don't yell at us. They don't take out their problems on us." *Id.* L.N.M. further testified on inquiry by the trial court:

> Q. You're saying your dad does [take out his problems on the household members]?
>
> A. Like, he yells at us when, like, when he's upset. He takes it out on other people sometimes.

*Id.* at 215.

_____

> A. Yeah. But [in Father's other house] when I was, like, 8 [years old] . . . [t]here was other holes in the wall too from when they were punched. Daddy punched them in.
>
> Q. Okay. Does your dad ever say any bad things about you when he's punching holes or anything like that?
>
> A. No.
>
> Q. He's just angry?
>
> A. Yes.
>
> Q. Is he angry at [Stepmother]?
>
> A. I guess. I don't know.
>
> Q. You don't really know why he's angry?
>
> A. No.

*Id.* at 244-245.

Nevertheless, L.N.M. testified that she has "fun" at Father's house working in the garden and planting flowers. *Id.* at 217. She testified that Father's garden is "really, really big." *Id.* She also testified that she enjoys playing with her go-cart and with the animals at Father's house. *Id.* L.N.M. specifically testified that she likes walking her miniature pony around the yard. *Id.* Further, she testified that she likes going fishing with Father and Stepmother at the sportsmen's club. *Id.* at 230-231.

At the conclusion of the testimonial evidence, the trial court scheduled a hearing for June 11, 2018, during which it would review the relevant statutory best interest factors on the record in open court and announce its custody decision. However, on June 7, 2018, Mother filed a petition alleging inappropriate conduct by Father and Stepmother toward L.N.M. following her *in camera* interview. Specifically, Mother alleged they "yelled at [L.N.M.] and 'got in her face' for telling the [c]ourt that [she] desired to be in the primary custody of [Mother]"; Stepmother told L.N.M. that she "had kicked daddy in the back" by telling the court that he punched holes in walls; and Stepmother told L.N.M., "guess what[,] sunshine, it's staying 50/50." Petition, 6/7/18, at ¶ 3(a), (c), (d). Mother requested that the court reopen the record and interview L.N.M. *in camera* regarding the allegations prior to issuing its custody decision.

The trial court explained, "In lieu of reopening the record and subjecting the child to another interview with the [c]ourt, the [c]ourt decided that the

best course was to appoint a guardian *ad litem* ("GAL") as permitted under 23 Pa.C.S. § 5334." Order, 11/2/18, at 2 (unpaginated). By order dated June 11, 2018, the court denied Mother's petition. By separate order the same date, the court continued the aforementioned hearing and appointed a GAL to "determine what, if any, impact the parties' conduct has had upon the child during the course of the current custody trial and the time thereafter." Order, 6/11/18. The GAL met separately with L.N.M., Mother, and Father, and he interviewed Stepmother over the telephone. The GAL issued his report on August 29, 2018.[3] Thereafter, the court rescheduled the hearing for the announcement of its custody decision for October 4, 2018.

In his report, the GAL concluded, "the allegations in Mother's Motion are most likely true and that there was an incident involving [L.N.M.] and Stepmother as alleged." R.R. at 114 (Report, 8/29/18, at 5). He continued:

> Nevertheless, it is also clear to the undersigned that such incidents as those alleged in Mother's Motion are not unusual in this case and both parents are responsible at one time or another of similar behavior. This current incident is just the latest in a long series of similar episodes that have occurred throughout [L.N.M.]'s life, and therefore the impact of this specific incident on [L.N.M.] is minimal.[4] It is equally clear to the undersigned that both parents

---

[3] In his report, the GAL stated, "After several [GAL] appointments [in this case] and withdrawals due to conflicts, the undersigned was appointed as [GAL] on July 13, 2018." Reproduced Record (R.R.) at 111 (Report, 8/29/18, at 2).

[4] Regarding Mother's allegations, the GAL stated that he "did not press [L.N.M.] for specifics in order to avoid tainting [L.N.M.]'s memory and suggesting the answers to her." R.R. at 113 (Report, 8/29/18, at 4). He

are unable to co-parent with each other and that failure is having a negative impact on [L.N.M.]. Notwithstanding these issues, [L.N.M.] still wishes to spend an equal period of time with both parents and the undersigned believes that doing so is in her best interests. In fact, the undersigned is concerned that awarding primary custody to one parent would negatively impact [L.N.M.]'s relationship with the other parent significantly and permanently. It is readily apparent that both parents care deeply for [L.N.M.] and [L.N.M.] reciprocates those emotions; the issues are between Mother and Father[,] and [L.N.M.] should not have to suffer the loss of a relationship with either parent because her parents cannot get along.

The undersigned does not believe, however, that the current schedule of 2/2/3 is in the best interests of [L.N.M.]. Based on [L.N.M.]'s stated preference that she does not like the 2/2/3 schedule and the inability of the parties to co-parent, the undersigned would recommend a week on, week off schedule. Such a schedule would retain shared physical custody but limit the number of exchanges and potential for issues such as forgotten homework assignments.

R.R. at 114-115 (Report, 8/29/18, at 5-6).

Indeed, the GAL found L.N.M. "bright, cheerful, and intelligent." *Id.* at 112. Further, L.N.M. "stated that she enjoys spending time with all of her siblings at both Mother's and Father's residences." *Id.* However, L.N.M. "indicated that fights and issues are common between Mother and Father." *Id.* at 113. The GAL continued:

---

further stated, "she did not immediately jump to discussing the allegations but rather had to be steered towards discussing these matters by the [GAL] after speaking extensively about her favorite activities and other matters." R.R. at 114.

An example raised by [L.N.M.] was regarding her backpack and homework assignments.[5] [L.N.M.] stated that there have been numerous times when homework . . . assignments would be forgotten at one parent's house and [L.N.M.] was unable to retrieve the missing homework. [L.N.M.] also stated that both parents were protective of what items they bought for [L.N.M.] and that those items had to remain at that parent's home. Despite the issues, however, when asked, [L.N.M.] indicated that she did not have a strong desire to be with either Mother or Father in that she wished to keep the custodial time equal. [L.N.M.] did express a desire that the current 2/2/3 custody schedule be changed because she felt the frequent exchanges were causing issues between Mother and Father, such as with homework.

---

[5] During her *in camera* interview on May 30, 2018, L.N.M. testified that she has a book bag at Mother's house and a separate book bag at Father's house. N.T., 5/30/18, at 239. She explained:

Q. You take those to school?

A. No. Like, on my mom's side, I take her book bag. If it's a half day, I go to my dad's. I have to take it to my dad's then switch them.

Q. And then what, you give the other book bag back to your mom?

A. Like, when I get there, I have to switch the book bags again. Then I have to go to my mom's and use it there.

Q. Do you like using two book bags or would it be better to have one book bag?

A. One[,] because one time, my book was in my other book bag at my dad's. I was with my mom. He wasn't able to get it for me. Then I had to go to school without my book.

*Id.* at 239. L.N.M. further testified that she does not know why she cannot take book bags back and forth between Mother's and Father's homes. *Id.* at 243.

*Id.*

By order dated and entered on October 5, 2018,[6] the trial court awarded shared legal and equally shared physical custody on an alternating weekly basis, beginning and ending on Fridays at 4:00 p.m. The court directed, "The parties shall begin making use of an electronic, digital or internet based family coordination calendaring system to exchange information within 30 days of the date of this order." *Id.* at ¶ 1(a).

Further, the court directed the parties to cooperate with the GAL "to review options for the child's extracurricular participation in a sporting or similar group activity." Order, 10/5/18, at ¶ 1(a). The court directed that L.N.M. and the GAL "develop a plan of enrollment and attendance so that the child can fully participate in the activity through the 2018-2019 school year[,] or if the activity the child chooses begins in 2019, the parties will insure the child fully participates throughout 2019." *Id.*

In addition, the court directed Father to submit to a drug and alcohol evaluation within 30 days of the date of the order, and to participate in recommended treatment, if any. *Id.* at ¶ 7.

---

[6] Mother does not assert any prejudice as a result of the delay in the court's custody decision, nor do we discern any.

On October 23, 2018, Mother timely filed a notice of appeal.[7] The trial court filed its Rule 1925(a) opinion on November 2, 2018.

On appeal, Mother presents the following issue for our review:

Should this [C]ourt reverse the trial court where the trial court clearly failed to enter an Order providing for the best interests of [L.N.M.], where there was clear and convincing evidence that Father and [Stepmother] engaged in below standard parenting, placed [L.N.M.] at risk due to criminal activity, and where Father refused to engage in co-parenting -- instead engaging in profane and belligerent behavior?

Mother's brief at 7.

We review Mother's issue according to the following scope and standard of review:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

_____

[7] Mother did not file a concise statement of errors complained of on appeal simultaneously with the notice of appeal as required by Pa.R.A.P. 1925(a)(2)(i) and (b). On October 30, 2018, Mother filed a concise statement. Father asserts no prejudice as a result of Mother's procedural violation, and we are aware of none. Therefore, we do not quash or dismiss this appeal. *See In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009).

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014). In addition,

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well[-]being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006), *citing* *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004).

Child custody actions are governed by the Child Custody Act, 23 Pa.C.S. §§ 5321-5340. Trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order." ***J.R.M. v. J.E.A.,*** 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original); ***see also A.V.***, ***supra*** at 823 (citation omitted) (providing that trial courts shall set forth the mandatory assessment of the Section 5328(a) best interest factors "prior to the deadline by which a litigant must file a notice of appeal"). This statutory section provides as follows.

### § 5328. Factors to consider when awarding custody.

(a) *Factors.* – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

On appeal, Mother argues that the evidence of record and the subsequent GAL report "clearly warranted that the [c]ourt award primary

physical custody to Mother." Mother's brief at 12. Mother emphasizes the surveillance video of the grocery store parking lot on December 1, 2017,[8] authenticated by Steven Hunt and admitted into evidence. During the trial, Mother testified that she was in the parking lot to transfer custody of L.N.M. to Father and Stepmother. N.T., 5/30/18, at 23. Father did not attend the custody transfer. Mother testified that she made the custody transfer and was leaving the parking lot when Stepmother "crashed into me. . . . She gets out [of her car] then tries to get at me through my vehicle. I locked the door." *Id.* at 26-27. Mother also testified that Stepmother screamed at her, and that she "heard the kids screaming too."[9] *Id.* at 28.

The parties' counsel stipulated that Stepmother pleaded guilty to the crime of simple assault related to this incident. *Id.* at 28. Upon inquiry by the trial court, Stepmother acknowledged that she is "under supervision" for the crime for two years. *Id.* at 185. By court order, Stepmother is prohibited from having any contact with Mother. *Id.* at 170-171, 186-187.

---

[8] Mother erroneously states in her brief that the incident occurred on December 21, 2017. The testimonial evidence reveals that the incident occurred on December 1, 2017.

[9] Mother testified that L.N.M., then age ten, was in Stepmother's vehicle at the time of the incident, along with Stepmother's daughter, A.G. N.T., 5/30/18, at 28, 173.

In addition, Mother asserts that the evidence of record demonstrates "Father's unwillingness to co-parent." Mother's brief at 14. She refers this Court to her testimony that "Father makes modifications to the [c]ourt [o]rder unilaterally, . . ., removes items from the child's book bag and that he speaks awfully about Mother in text messages[10, 11] and in person, in front of the

---

[10] Mother introduced multiple text messages to her from Father, which the court characterized as demonstrating "constant negative interactions" between the parties. N.T., 10/4/18, at 4, 16.

[11] Mother refers us to Father's testimony on cross-examination wherein he acknowledged calling Mother profane names in text messages. *See* N.T., 5/30/18, at 142-144. Further, Mother emphasizes the following testimony by Father on cross-examination:

Q. Can you tell me what you texted [Mother] about [L.N.M.'s] education? Read the whole sentence.

A. [L.N.M.]'s education will go as I say. Not over my dead body will she do anything you say when it comes to her future.

Q. [Do] you feel that is cooperative parenting . . . ?

A. I agree that I can be mean and pushing and things at times. I feel I have to voice my opinion louder in order for her to see my perspective.

Q. So you feel it's proper parenting?

A. No.

Q. Let me finish my question. Proper co[-]parenting calling the mother of your child a [b----], a stupid [---], tell her she's a joke, that she shouldn't bring kids [into] the world when she's a kid herself, tell her over your dead body will she have a say in [educational] decisions in the future?

child." *Id.* at 13. Further, Mother emphasizes her testimony that she "has also not been able to sign the child up for extracurricular activities due to Father harassing her at such events or refusing to bring the child to practices and games. The child was very disappointed in only being able to attend one-half of her events." *Id.* (citations to reproduced record omitted).

Mother argues that additional evidence demonstrates the court abused its discretion in failing to grant her primary physical custody. Specifically, Mother refers this Court to photographs that she introduced demonstrating "proof of Father's propensity to use alcohol including around the subject child."[12] Mother's brief at 15. In addition, Mother argues that L.N.M.'s *in*

_____

. . .

> A. I don't feel it's right. But yes, I did say it. And in that aspect, I have worked on my words and terminology. They're older text messages. I have watched how I talk to people. Not people, but [Mother]. I get along with most other people.

*Id.* at 145-146.

[12] Mother introduced Exhibit 7 during the trial, which was a photograph of L.N.M., Stepmother, Stepmother's mother, and other unidentified people. Mother testified that the photograph depicted "a lot of people holding" alcohol, and that L.N.M. was depicted with a six pack of Yuengling beer between her legs. N.T., 5/30/18, at 47. Father testified that Mother's Exhibit 7 depicts his hay wagon, which he was driving at the time. *Id.* at 139-140. He testified that he did not know when it happened that L.N.M., who was depicted on the hay wagon, straddled a six pack of beer. *Id.* at 139. Father testified, "I never take [L.N.M.] around people that are falling over drunk, crazy party. It's family and friends. Everybody is having a beer or two. Not everybody. Couple people in the family are having a beer or two and relaxing. It's nothing crazy." *Id.* at 140.

*camera* testimony weighs in favor of granting her primary physical custody. Finally, Mother argues that the GAL's report, which "found veracity" in Mother's allegations of improper conduct by Stepmother following L.N.M.'s *in camera* interview, supports granting her primary physical custody. As such, Mother contends that the court ignored the totality of the evidence and abused its discretion in granting a shared physical custody award.

The trial court considered the evidence in light of the statutory best interest factors on the record in open court on October 4, 2018. ***See*** N.T., 10/4/18, at 2-18. The court stated that it considered the GAL's report, along with the entire record. ***Id.*** at 3-4. The court found that L.N.M. "has a deep love for both parents," and she "has a deep desire to please both parents." ***Id.*** at 4. The court stated that it is primarily concerned in this case that granting primary physical custody to one parent, "given what evidence this [c]ourt has about the constant negative interactions [between the parties,] that there would . . . be the real potential for this child to have her love for the out-of-custodial parent undermined and affected." ***Id.*** at 4-5.

Relative to this concern are the court's findings with respect to Section 5328(a)(1), which party is more likely to encourage and permit frequent and

_____

We observe that, in her *in camera* interview, L.N.M. testified that Father "always has [beer], and he always drinks it." ***Id.*** at 233. She testified that Mother and her paramour drink alcohol on special occasions. ***Id.*** at 233. L.N.M. testified that maternal relatives do not drink, but that her paternal relatives do drink. ***Id.*** at 234.

continuing contact between the child and the other party. The court found, "both parents fall way below the standard there when it comes to giving this [c]ourt any assurance that they would permit frequent and continuing contact. Mere compliance with an order is hardly enough. But that's what this [c]ourt was presented with." *Id.* at 10. In addition, with respect to Section 5328(a)(13), the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another, the court found that both parties fall below the standard. *Id.* at 10. Because of the high level of conflict between Mother and Father, the court fashioned its order to do "almost as much as the [c]ourt views it reasonably can [do] to make sure the two parties have no interaction." *Id.* The court awarded the parties equally shared physical custody on an alternating weekly basis "to minimize the number of times there will be a[] [custody] exchange."[13] *Id.* at 12.

With respect to Section 5328(a)(2), (11), and (15), the court found them irrelevant in this case. The court explained that with Section 5328(a)(2),

_____

[13] We observe that the trial court did not expressly provide its analysis of Section 5328(a)(8), the attempts of a parent to turn the child against the other parent. Upon review, there is no testimonial evidence in this case that either parent attempted to turn L.N.M. against the other parent. The court found that L.N.M. is well aware of the negative interactions between her parents and Stepmother. Nevertheless, the court found that L.N.M.'s love for both parents remains strong. In fashioning the subject custody order, the court sought to limit, rather than advance, the parties' opportunities to attempt to turn L.N.M. against the other and/or for L.N.M.'s relationship with one parent to weaken due to a partial custody schedule. As such, we conclude that the court considered L.N.M.'s best interests in light of Section 5328(a)(8).

- 19 -

the present and past abuse committed by a party or member of the party's household, it found no abuse of L.N.M. in either household. However, the court discussed the parking lot car incident between Mother and Stepmother under this factor and stated it is concerned "about the irrational perspectives brought to such a[] [custody] exchange." *Id.* at 9. The court continued,

> [I]t's troubling to this [c]ourt that you could have an incident that could get so contorted and twisted.
>
> Why somebody can't exchange a child, remain parked for a few minutes, allow one party to move in and out of the parking area, these are things that are concerning to this [c]ourt. But at the end of the day, how was this child impacted and is it going to unfairly . . . affect her best interests overall and should one party have a far greater risk of loss of connectivity to [his or] her child because of an incident like that.

*Id.*

It is not this Court's role to dictate the amount of weight the trial court placed on the December 1, 2017 parking lot incident. *See A.V. v. S.T.*, *supra* (citation omitted). It is important to note that the evidence also revealed the existence of a court order barring Stepmother from having contact with Mother. In addition, Stepmother testified that she no longer participates in custody exchanges. *See* N.T., 5/30/18, at 179. The court considered the evidence related to the parking lot incident in light of L.N.M.'s best interests, and we discern no abuse of discretion.

The court weighed the remaining Section 5328(a) factors equally between the parties. With respect to Section 5328(a)(14), the history of drug or alcohol abuse of a party or member of a party's household, the court stated

it "cannot find conclusively that there is proof of alcohol abuse to a level such that it affects [F]ather's ability to be a parent." N.T., 10/4/18, at 5. Nevertheless, the court ordered Father to undergo a drug and alcohol evaluation and to participate in treatment, if recommended. We discern no abuse of discretion in this regard.

With respect to Section 5328(a)(7), the well-reasoned preference of the child, based on the child's maturity and judgment, the court found that L.N.M. "was overall reluctant to offer anything to this [c]ourt that seemingly would take a stand . . . with any certainty." N.T., 10/4/18, at 7. The court found:

> If this child truly did not love both of her parents, did not feel safe within those environments, this [c]ourt is of the opinion that she wouldn't have had the difficulties that she seemingly evidenced to this [c]ourt in both her statements and body language. She did not want to harm either parent. This [c]ourt believes genuinely that was motivated out of love and not fear, not coercion.

*Id.*

We do not disturb these credibility findings because the trial court observed L.N.M.'s demeanor and listened to her responses during her *in camera* interview. Further, insofar as L.N.M. testified that she feels more safe at Mother's than at Father's home, and that she desired to see Father every other weekend and on Wednesdays, we do not disturb the weight the court placed on this testimony based on its priority in preserving L.N.M.'s relationship with both parents, whom she loves. **See A.V. v. S.T.**, **supra** ("[O]n issues of credibility and weight of the evidence, we defer to the findings

of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.") (citation omitted).

Finally, contrary to Mother's assertion, we conclude that the trial court fashioned the subject custody order in accordance with the GAL's recommendation provided in the August 29, 2018 report. Although the GAL determined that Mother's allegations of Stepmother's improper conduct after L.N.M.'s *in camera* interview "are most likely true," the GAL stated that L.N.M. preferred "to keep the custodial time equal." R.R. at 113-114 (Report, 8/29/18, at 4-5). Further, the GAL stated that L.N.M. "did express a desire that the current 2/2/3 custody schedule be changed because she felt the frequent exchanges were causing issues between Mother and Father, such as with homework." *Id.* at 113. The GAL agreed with L.N.M. and recommended to the court, "Based on [L.N.M.]'s stated preference that she does not like the 2/2/3 schedule and the inability of the parties to co-parent, the [GAL] would recommend a week on, week off schedule. Such a schedule would retain shared physical custody but limit the number of exchanges and potential for issues such as forgotten homework assignments." *Id.* at 115. Indeed, the trial court stated on the record in open court that an alternating weekly custody schedule would "minimize the number of times" there will be a custody exchange. N.T., 10/4/18, at 12. Further, the court declined awarding primary physical custody because of "the real potential for this child to have

her love for the out-of-custodial parent undermined and affected" in light of the "constant negative interactions" between the parties. *Id.* at 4-5.

Based on our thorough review of the testimonial evidence and the trial court's rationale for its custody award, we discern no abuse of discretion. Based on the totality of the evidence, the court's conclusion that L.N.M.'s best interest is served by granting Mother and Father an alternating weekly physical custody schedule is reasonable. Accordingly, we affirm the order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2019